1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

Northern District of California

9   PHILLIP PLEVIN, TERESITA TORRES,

10              Plaintiffs,

11        v.

12   CITY AND COUNTY OF SAN
     FRANCISCO, et al.,

13              Defendants.

14   _____

No. C-11-02359 MEJ

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 52)**

15                          **I.  INTRODUCTION**

16        On August 12, 2011, Plaintiffs Phillip Plevin  and Teresita Torres filed their amended

17   complaint against the City and County of San Francisco ("CCSF") and San Francisco Police

18   Department ("SFPD") Officer Shaun Navarro.  Dkt. No. 32, First Am. Compl. ("FAC").[1]  Plaintiffs

19   alleged that Defendants are liable under 42 U.S.C. § 1983 ("Section 1983") for violating their First,

20   Fourth, and Fourteenth Amendment rights due to Navarro's inadequate investigation of their hit and

21   run accident.  Defendants have now moved for summary judgment on each of Plaintiffs' claims.

22   Dkt. No. 52.  Plaintiffs have opposed this motion, to which Defendants have filed a reply.  Dkt. Nos.

23   60 and 64.  For the reasons explained below, Defendants' motion is GRANTED in its entirety.

24                          **II.  BACKGROUND**

25   _____

26        [1] Plaintiffs initiated this action on December 6, 2010 in San Francisco County Superior
     Court.  On May 12, 2011, Defendants removed the lawsuit to this Court.  Dkt. No. 1.  Defendants
27   then moved to dismiss Plaintiffs' complaint on June 6, 2011.  Dkt. No. 15.  Defendants' motion was
     granted but Plaintiffs were afforded leave to amend.  Dkt. No. 31.  Plaintiffs amended their
28   complaint and filed it with this Court on August 12, 2011.  Dkt. No 32.

UNITED STATES DISTRICT COURT
For the Northern District of California

Plaintiffs' claims stem from a hit and run accident that took place on December 18, 2009. On that day, Plevin was driving his Harley Davidson motorcycle westbound on Geary Boulevard with Torres as his passenger.  Dkt. No. 65,  Joint Statement of Undisputed Facts ("JSF") ¶1.  Plevin — who was a member of the Bay Riders Motorcycle Club ("Bay Riders") — was wearing a leather vest with the Bay Riders' insignia on the back, commonly referred to as the club's "colors."  JSF ¶¶2, 3.  Plevin attempted to "veer" his motorcycle into an open lane on his right-hand side when a southbound truck "blew" a stop sign and turned directly into the lane that Plevin was headed.  JSF ¶¶5, 6.  Plevin did not enter the right-hand lane and instead turned his motorcycle back into his original lane.  JSF ¶8.  The truck continued westbound at a faster speed than Plevin, but he was eventually able to catch up with it.  JSF ¶¶9, 10.  Plevin pulled up next to the truck driver and essentially signaled to him through hand gestures to "watch where [he] was going."  JSF ¶11.  In response to Plevin's gestures, the truck driver gave him a "dirty look" and swerved the truck into Plevin's lane, striking the motorcycle and causing it and Plaintiffs to fall.  JSF ¶13.  The truck driver then fled the scene and turned off of Geary Boulevard at the next intersection.  JSF ¶14.  After Plevin and bystanders assisted Torres to the sidewalk, Plevin remounted his motorcycle and pursued the truck driver.  JSF ¶¶15, 16.  He was unsuccessful in locating the truck and returned to the scene within five minutes.  JSF ¶17.

Navarro and his partner, Officer Christine Magayanes, were dispatched to the scene of the accident.  JSF ¶20.  Navarro was responsible for conducting the investigation and writing the report of the incident.  JSF ¶21.  Upon arriving, Navarro interviewed witness Hui Cha Leung, while his partner interviewed witnesses Abigail O'Leary and Vida Lamastra.  JSF ¶22.  Navarro testified that he also recalls interviewing an older woman who appeared intoxicated.  JSF ¶23.  The parties dispute whether the witnesses provided the Officers with one or two potential license plate numbers for the truck driver.  Plaintiffs claim that Navarro obtained one plate number from the intoxicated woman and Magayanes obtained a more reliable plate number from O'Leary, which Navarro learned about since he reviewed Magayanes' notes before writing his report.  *See* Motion at 8-9.  Defendants claim that Navarro incorrectly believes that he learned about a plate number from the intoxicated

UNITED STATES DISTRICT COURT
For the Northern District of California

1    woman, when in fact there was only one plate number that he knew about (the one provided by

2    O'Leary), which was conveyed to him through Magayanes. *See* Reply at 5-6.

3         Plaintiffs refused medical attention at first, but were eventually taken by ambulance to San

4    Francisco General Hospital. JSF ¶24.[2]  Because Navarro was unable to interview Plaintiffs at the

5    scene, he traveled to the hospital to talk with them. JSF ¶27.  Before doing so, Navarro, using his

6    patrol car's mobile computer, performed two searches in the DMV database on the potential license

7    plate number of the truck that he had received. JSF ¶38.  Both queries were saved and memorialized

8    in the Computer Aided Dispatch ("CAD") event history for the incident. JSF ¶39.

9         At the hospital, Navarro obtained Plevin's version of the incident and his contact

10   information. JSF ¶29.  Plevin asked Navarro if the Officers had obtained a license plate number for

11   the truck. JSF ¶29.  According to Plevin, Navarro asked him questions about the Bay Riders, but

12   Plevin cannot recall anything specific about those questions. JSF ¶30.[3]  Navarro then interviewed

13   Torres, who also provided him with an account of the accident and her contact information. JSF

14   ¶¶35, 37.  Torres testified that Navarro told her "Don't worry. We have the plate. We are going to

15   get him." JSF ¶37.

16        During the interview, Plevin was holding onto his Bay Riders vest or "colors." JSF ¶31.

17   Plevin testified that Navarro reached for the vest "not in a rough way but in a 'here let me grab that'

18   manner." JSF ¶32.  Plevin believed that the way Navarro touched the vest, that if he were to let go

19   of it, Navarro would have grabbed it. JSF ¶32.  Because Bay Riders members do not let non-club

20   members take their "colors," Plevin refused to hand over his vest. JSF ¶33.  Navarro took his hands

21   off the vest and made no further attempt to take it. JSF ¶34.

22        After leaving the hospital, Navarro "played around" with the earlier license plate number by

23   transposing a letter and number and then doing one more DMV search on his mobile computer. JSF

24   ¶40.  The search returned results that "didn't make sense" to Navarro. JSF ¶40.  This query was also

25   _____

26        [2] Plevin testified that he had roadrash on his thigh and pain in his hip, leg, and back.  JSF
     ¶25.  Torres testified that she had pain in her right leg.  JSF ¶26.

27

28        [3] Before speaking with Navarro, Plevin was medicated with morphine.  JSF ¶28.

saved and memorialized in the CAD event history.  JSF ¶41.  Navarro then wrote the official report for the incident.  JSF ¶42.  Navarro included the accounts of the three witnesses interviewed by himself and Magayanes.  JSF ¶43.  But he did not list any license plate numbers in his report.  *See* Dkt. No. 58, Navarro Decl., Ex. A.  Navarro explained that because the invalid licence plate number was preserved in the CAD and since it did not provide any useful information (even after he "played around" with the number), he elected not to include the license plate number in his report.  JSF ¶44.

After the accident, Plaintiffs obtained a copy of the incident report and reviewed it.  JSF ¶54.  They did not conduct an independent investigation into the identity of the truck driver.  JSF ¶58.  They also did not contact Navarro to ask about the incident report or whether he had a license plate number for the truck driver.  JSF ¶55.  Nor did they contact the SFPD to ask whether it had the license plate number.  JSF ¶55.  It was not until December 30, 2011 — more than one year after Plaintiffs first initiated this action and nearly one month after the FAC was filed — that Plaintiffs, for the first time, requested documents and information from Defendants about a potential license plate number for the truck driver.  JSF ¶¶61, 62.  On February 7, 2012, Defendants provided to Plaintiffs the CAD event history of the incident, which contained documentation of Navarro's searches with respect to the plate number.  JSF ¶63.

Plaintiffs never filed a state court action against the unidentified truck driver (and the statute of limitations for any such claim has expired).  JSF ¶60.  Instead, Plaintiffs initiated this Section 1983 lawsuit against Defendants.  Specifically, they alleged that due to their affiliation with the Bay Riders, Defendants conducted an inadequate investigation of the accident and destroyed any clues about the truck driver's identity, particularly any potential license plate number.  This violated their First Amendment rights by denying them access to the courts and chilling their rights to freedom of expression and freedom of expressive association.  Plaintiffs' Fourth Amendment rights were allegedly infringed by Navarro's attempt to seize Plevin's vest.  Lastly, Plaintiffs claimed that their Fourteenth Amendment rights were violated since Defendants treated them differently due to their Bay Riders membership.

### III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Summary judgment is appropriate only when there is no genuine dispute of material fact and

2  the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party

3  bears both the initial burden of production as well as the ultimate burden of persuasion to

4  demonstrate that no genuine dispute of material fact remains.  *Nissan Fire & Marine Ins. Co., Ltd. v.*

5  *Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Once the moving party meets its initial

6  burden, the nonmoving party is required "to go beyond the pleadings and by [its] own affidavits, or

7  by the depositions, answers to interrogatories, and admissions on file, designate specific facts

8  showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)

9  (internal quotations and citations omitted).  On summary judgment, courts are required to view the

10  evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v.*

11  *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If a reasonable jury could return a verdict in favor of

12  the nonmoving party, summary judgment is inappropriate.  *Anderson v. Liberty Lobby, Inc.*, 477

13  U.S. 242, 248 (1986).

14                          **IV.  DISCUSSION**

15    The Court analyzes each of Plaintiffs' claims in turn below.

16  **A.  First Amendment Claim**

17        1.  Right to Access Courts

18    One of the protections offered by the First Amendment is the right to meaningfully access the

19  courts.  *Delew v. Wagner*, 143 F.3d 1219, 1222 (9th Cir. 1998).  This not only protects an

20  individual's right to physically enter the courthouse, "but also insures that access to courts will be

21  adequate, effective and meaningful."  *Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir.

22  1997) (internal quotations and citation omitted).  "Therefore, if a party engages in actions that

23  effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they

24  [sic] have violated his right of access to the courts."  *Id.* at 1262; *see also Delew*, 143 F.3d at 1222

25  (citing *Swekel* and explaining that a right of access claim is "established where a party engages in

26  pre-filing actions which effectively covers-up evidence and actually renders any state court remedies

27  ineffective").

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Defendants argue that Plaintiffs' right of access claim is not actionable because they never

2    attempted to file a lawsuit against the truck driver.  Because Plaintiffs never pursued a remedy under

3    state law, they cannot now assert that Defendants rendered their state court remedy ineffective.

4    Defendants point out that *Swekel* noted the following: "Before filing an 'access to courts' claim, a

5    plaintiff must make some attempt to gain access to the courts; otherwise, how is this court to assess

6    whether such access was in fact 'effective' and 'meaningful'?" 119 F.3d at 1264.  Plaintiffs, on the

7    other hand, argue that a right of access claim does not include a per se threshold that requires a party

8    to first pursue the underlying action.  Plaintiffs contend that *Swekel* created an exception to this by

9    recognizing that "in some instances it would be completely futile for a plaintiff to attempt to access

10   the state court system." 119 F.3d at 1264 n. 2.

11   The Court agrees with Plaintiffs' position that under certain circumstances, albeit rare, a

12   party should not be required to first bring the underlying action before being allowed to initiate a

13   right of access claim.  This includes the scenario where a cover-up is so pervasive that it would

14   prevent a party from successfully litigating any underlying action.[4]  But the Court finds that the

15   undisputed facts presented here do not warrant the application of this rare exception.  The purpose

16   behind a right of access claim is to provide a remedy for a party who was actually prohibited from

17   obtaining relief from a court.  This means that the party must in fact attempt to access or get relief

18   from a court for its underlying claim.  *See Swekel*, 119 F.3d at 1264 (denying the plaintiff's right of

19   access claim because "none of the evidence before this court establishes that Swekel even attempted

20   to go to the state court in [the] first instance" and consequently "there is no evidence that the

21   defendants' actions actually rendered any available state court remedy ineffective").  In other words,

22   the Court finds that it would be improper to allow a party to claim that they were denied access to a

23   court when they never even attempted to access that court.

24

25   [4] This view is supported by the United States Supreme Court's decision in *Christopher v.

26   Harbury*, a case that neither party cites in their briefs.  536 U.S. 403 (2002).  The *Christopher* court,
     in a footnote, appears to approve of the Court of Appeals decision to reject a rule that would require

27   a plaintiff to first initiate an action on the underlying claim before bringing a right of access claim, if
     such an underlying suit would be futile.  *Id.* at 416 n. 14.

28

6

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Plaintiffs argue that any attempt on their part to file a claim against the truck driver would

2    have been futile since Navarro destroyed all evidence with respect to the "second license plate

3    number," thereby negating any chance of locating the truck driver.  This argument, however, is

4    misleading.  Plaintiffs could have only fully developed their theory about the "second license plate

5    number" after the statute of limitations for filing a claim against the truck driver had run.  *See* JSF ¶¶

6    61-63 (providing that Plaintiffs did not request information about a potential license plate number

7    from SFPD until December 2011, more than two years after the accident).[5]  Thus, Plaintiffs contend

8    that they were prevented from filing a claim against the truck driver because Navarro destroyed

9    evidence, even though they did not do anything to attempt to file such a claim and only definitively

10   learned what happened with respect to the license plate number after the statute of limitations for

11   their underlying claim had expired.  Under such circumstances, the Court finds that Plaintiffs never

12   attempted to exercise their rights under the First Amendment to access the courts and therefore this

13   right could not have been infringed by Defendants.  Defendants' motion on this ground is

14   consequently GRANTED.

15        2.  Freedom of Expressive Conduct

16   The First Amendment protects some forms of expressive conduct.  *Spence v. State of

17   Washington*, 418 U.S. 405, 409 (1974).  The parties devote a significant portion of their briefs

18   debating whether Plaintiffs can establish that Plevin's wearing of his "colors" constituted expressive

19   conduct, pursuant to the two-part test set out in *Texas v. Johnson*. 491 U.S. 397, 404 (1989)

20   (explaining that the court must examine whether a plaintiff intended to convey a particularized

21   message and whether there was a great likelihood that this message would be understood by those

22   who viewed it).  The Court, however, does not need to analyze this issue because even if there was

23   expressive conduct, Plaintiffs have presented no evidence that Defendants actually "chilled" their

24   speech, which both parties agree is a necessary element of any First Amendment claim.

25   In their opposition, Plaintiffs argue that their speech was "chilled" because Plevin is no

26

27   ─────────────

28        [5] Plaintiffs did not even depose Navarro until August 2012.

7

UNITED STATES DISTRICT COURT
For the Northern District of California

1   longer a member of the Bay Riders due to the treatment he received from Defendants, which also

2   deterred Torres from ever becoming a member.  Plaintiffs cite to Plevin's deposition where he

3   explained that he was constantly harassed by the SFPD for his association with the Bay Riders,

4   including Navarro's handling of the hit and run accident.  Plaintiffs, however, were never prohibited

5   from associating with the Bay Riders by Defendants.  In other words, this matter is different from a

6   case where the government prohibits a motorcycle club, such as the Hells Angels, from wearing their

7   "colors" at a town festival or a restaurant.  *See Villegas v. City of Gilroy*, 363 F.Supp.2d 1207, 1217-

8   18 (N.D. Cal. 2005); *Kohlman v. Village of Midlothian*, 833 F.Supp.2d 922, 936 (N.D. Ill. 2011).  In

9   *Kohlman*, members of the Hells Angels brought an action against city officials and police officers

10  alleging that their First Amendment rights to expressive conduct were violated when the officers

11  ordered local restaurants and bars to not serve any Hells Angels members wearing the club's

12  "colors." *Id.* at 926.  *Kohlman* noted that "even if the defendants in fact harassed the plaintiffs due

13  to their membership in the Hells Angels . . . , there is no constitutional right to be free from

14  harassment by state officials." *Id.* at 939-40.  More importantly, Plevin conceded at his deposition

15  that he chose to disassociate with the Bay Riders on his own volition.  He explained that he "just

16  didn't want to be in the club.  I decided to go and do other things with my life."  Dkt. No. 55-4,

17  Plevin Depo. at 197-98.[6]  Based on the above, the Court finds that Plaintiffs have not presented any

18  evidence that their right to expressive conduct was chilled by Defendants.  Thus, Defendants'

19  motion on this claim is GRANTED.

20        3.   Freedom of Expressive Association

21        The First Amendment also protects the right to freedom of expressive association.  *Villegas*,

22  484 F.3d at 1141.  As with all protections under the First Amendment, any alleged restriction must

23  _____

24        [6] To the extent that Plaintiffs try to limit the damage of Plevin's deposition testimony by
      citing to his subsequent declaration in which he claims that he quit the Bay Riders due to
25    Defendants' harassment, the Court is not persuaded by such a self-serving declaration.  *See Kennedy
      v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).  Moreover, the declaration does not change
26    the fact that Plevin voluntarily resigned his membership and there is no evidence that Defendants
27    forced him to do so.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   "affect or impede" the plaintiff's ability to freely associate with an expressive association. *Boy*

2   *Scouts of America v. Dale*, 530 U.S. 640, 650 (2000). As explained above, Plaintiffs have not

3   presented any persuasive evidence that their right to freely associate with the Bay Riders was

4   "chilled" by Defendants, especially since Plaintiffs voluntarily chose to walk away from their

5   association with the club. Without such evidence, this also cannot withstand summary judgment and

6   Defendants' motion on it is GRANTED.

7   **B. Fourth Amendment Claim**

8           The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const.,

9   Amend. IV. A "seizure" of property occurs when there is some "meaningful interference" with an

10  individual's possessory interest in that property. *United States v. Jacobsen*, 466 U.S. 109, 113

11  (1984); *see also United States v. Va Lerie*, 424 F.3d 694, 702-706 (8th Cir. 2005) (explaining that

12  the Fourth Amendment prohibits government "conversion" of an individual's private property — as

13  opposed to the "mere technical trespass" of such property — and therefore the police do not seize

14  property every time they simply handle it). In *Scott v. City of Couer D'Alene*, the court evaluated

15  what constitutes meaningful interference when it analyzed the plaintiffs' claims that police officers

16  violated their Fourth Amendment rights by attempting to seize their camcorder. 2010 WL 3735679

17  (D. Id. Aug. 6, 2010). Because the police officers only attempted to take the camcorder and did not

18  actually seize it, *Scott* held that "*no meaningful interference* with Plaintiffs' possessory interest in

19  the video camera occurred, [thus] the camera was not 'seized' within the meaning of the Fourth

20  Amendment." *Id.* at *3-4, 13 (emphasis added).

21          Based on the above case law, Plaintiffs' claim that their Fourth Amendment rights were

22  violated when Navarro attempted to seize Plevin's vest cannot withstand summary judgment. At the

23  hospital, Navarro only momentarily touched the vest when he was considering whether to take it as

24  evidence, and when Plevin objected, Navarro complied with his request, let go of the vest, and did

25  not seize it. JSF ¶¶ 32-34. This "mere technical trespass" does not amount to a meaningful

26  interference with respect to Plevin's possessory interest in the vest and consequently, similar to the

27  holding in *Scott*, there is no Fourth Amendment violation. Defendants' motion is therefore

28

9

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  GRANTED with respect to Plaintiffs' Fourth Amendment claim.[7]

2  **C. Fourteenth Amendment Claim**

3       The Equal Protection Clause of the Fourteenth Amendment commands that no state shall

4  deny to any person within its jurisdiction the equal protection of the laws.  U.S. Const. Amend. XIV.

5  The Amendment is "essentially a direction that all persons similarly situated should be treated

6  alike." *City of Cleburne v. Cleburne Living Ctr.*, 474 U.S. 432, 439 (1985) (quoting *Plyer v. Doe*,

7  457 U.S. 202, 216 (1982)).  To survive summary judgment on such a claim, "a plaintiff must come

8  forward with facts showing that 1) the state treated him differently than other similarly situated

9  individuals and 2) that there is no rational basis for the different treatment."  *Kohlman*, 833

10  F.Supp.2d at 933 (analyzing an equal protection claim brought by members of the Hells Angels

11  motorcycle club).  In *Kohlman*, the court granted summary judgment to the defendants because the

12  plaintiffs did not offer any evidence or identify any other specific similarly situated individuals who

13  were treated differently than them.  *Id.* at 934-35 ("Therefore, to establish that members of the Hells

14  Angels and other motorcycle clubs are materially similar, the plaintiffs must point to members of

15  other motorcycle clubs with a similar record of interaction with Midlothian officials and show that

16  they were treated differently.  Because the plaintiffs have not identified any specific similarly

17  situated people who were treated differently, let alone people who are similarly situated in all

18  material respects, their 'class of one' equal protection claim fails.") (internal citation omitted).

19       Here, Plaintiffs' opposition only devotes one paragraph in response to Defendants' argument

20  that the Fourteenth Amendment claim cannot withstand summary judgment.  Plaintiffs explain that

21  their equal protection claim is based on Defendants treating them differently due to their association

22  with the Bay Riders.  Opp. at 19.  For evidentiary support of this claim, Plaintiffs cite to Plevin's

23  ───────────────

24       [7] Plaintiffs base this claim on essentially the same allegations that were found insufficient by the Court when it granted Defendants' motion to dismiss.  In that order, the Court explained that

25  Plaintiffs' unreasonable seizure claim was not actionable since Navarro never meaningfully interfered with Plevin's possessory interest in the vest and there was no indication that Torres had

26  any possessory interest in his vest. Dkt. No. 31.  Plaintiffs' opposition to Defendants' motion for summary judgment, which does not even address the viability of how Torres can assert a claim with

27  respect to Plevin's vest, does nothing to alter the Court's earlier analysis.

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  declaration that he felt that he was discriminated against, Navarro's brief confrontation with Plevin

2  at the hospital with respect to his vest, and Navarro's failure to include in his report the "second

3  license plate number" provided by Magayanes. *Id*. at 19.  Plaintiffs argue that "[b]ecause Navarro

4  did not author the report until after visiting the hospital, and thus after the confrontation in which

5  Plevin refused to give Navarro his vest, it is reasonable to infer that the subsequent concealment or

6  destruction of the second license plate number was done without any rational basis, but instead was

7  carried out with an intent to discriminate against plaintiffs solely because they were members and

8  associates of the Bay Riders." *Id.* at 19.

9           Plaintiffs, however, do not identify any similarly situated individuals who were treated

10  differently than them, as the *Kohlman* court required for an equal protection claim to be viable.

11  Moreover, Plaintiffs' claim essentially only rests on speculative inferences that Defendants acted

12  with discriminatory intent without providing any specific evidence of such discrimination.  *See, e.g.*,

13  JSF ¶53 ("Plevin testified that he has heard of unspecified members of the Bay Riders being

14  detained on an unspecified number of occasions by unspecified SFPD members on unspecified

15  dates.").  Due to these reasons, the Court finds that Plaintiffs' Fourteenth Amendment claim fails as

16  a matter of law and Defendants' motion on this ground is GRANTED.[8]

17                                    **V.  CONCLUSION**

18           Because the Court finds that there are no triable issues of fact with respect to any alleged

19  constitutional violations by Defendants, it does not need to consider whether Navarro is entitled to

20  qualified immunity.[9]  Similarly, since Plaintiffs have not set forth an actionable claim for any

21

22           [8] As explained earlier, *Kohlman* also pointed out that "even if the defendants in fact harassed

23  the plaintiffs due to their membership in the Hells Angels . . . , there is no constitutional right to be
     free from harassment by state officials."  833 F.Supp.2d at 939-40.

24

25           [9] In determining whether qualified immunity applies, the Court must consider (1) whether the
     alleged facts "make out a violation of a constitutional right," and (2) if so, whether the right "was

26  'clearly established' at the time of defendant's alleged misconduct."  *Pearson v. Callahan*, 555 U.S.
     223, 232 (2009).  The Court may consider these two steps in any order.  *Id*. at 236; *see also Roska v.

27  Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006) ("To overcome a qualified immunity defense, a

28  plaintiff must first establish a violation of a constitutional or statutory right and then show that the

violation of their constitutional rights, they cannot attach municipal liability against CCSF under

*Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).[10]  Accordingly,

Defendants' motion for summary judgment is GRANTED in its entirety.

**IT IS SO ORDERED.**

Dated: December 4, 2012

_____
Maria-Elena James
United States Magistrate Judge

right was clearly established.").

[10] *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights.  Here, the municipal defendants cannot be held liable because no constitutional violation occurred.").